960 A.2d 405 (2008)
404 N.J. Super. 16
Antonia VERNI, an infant, by her guardian ad litem, Albert BURSTEIN, and Fazila Baksh Verni, Individually, Plaintiffs-Respondents,
v.
Daniel R. LANZARO, Ronald A. Verni, The New Jersey Sports & Exposition Authority, New York Giants, Giants Stadium, Shakers, The Gallery, Michael Holder, Elrac, Inc. d/b/a Enterprise Rental Car, Toyota Motor North America, Inc., Paul Smith, National Football League, and Paul Tagliabue-Commissioner, Defendants, and
Harry M. Stevens, Inc. of New Jersey, Aramark Services Management of New Jersey, Inc., Aramark Corporation, and Aramark Sports and Entertainment Group, Inc., Defendants-Respondents, and
Public Citizen, Intervenor-Appellant.
No. A-1816-07T3
Superior Court of New Jersey, Appellate Division.
Argued October 8, 2008.
Decided December 3, 2008.
*407 Alan Y. Medvin, Newark, argued the cause for appellant (Medvin & Elberg and Public Citizen Litigation Group, attorneys; Mr. Medvin and Gregory A. Beck, on the brief).
David A. Mazie, Roseland, argued the cause for respondents Antonia Verni, by her guardian ad litem, Albert Burstein, and Fazila Verni (Mazie Slater Katz & Freeman, LLC, attorneys; Mr. Mazie and David M. Freeman, on the brief).
David W. Field, Roseland, argued the cause for respondents Harry M. Stevens, Inc. of N.J. and Aramark Services Management of N.J., Inc. (Lowenstein Sandler PC, attorneys; Mr. Field and Priya R. Masilamani, on the brief).
Before Judges CUFF, FISHER and BAXTER.
The opinion of the court was delivered by
CUFF, P.J.A.D.
Antonia Verni suffered catastrophic injuries in an automobile accident. She is now a ventilator-dependent quadriplegic who will require significant medical care her entire life. She was two years old at the time of the accident in 1999. Her mother, Fazila Verni, also suffered serious injuries in this accident. She has recovered from these injuries. The driver of the car that collided with the car driven by Antonia's father was intoxicated, having consumed copious amounts of alcohol in the parking lot of Giants Stadium prior to a football game and inside the stadium during the game.
Antonia and her mother commenced a civil action against the driver of the other vehicle, the dispenser of alcoholic beverages inside the stadium, the owner and operator of the stadium, the National Football League and its commissioner, two other bars at which the other driver stopped after the game, and the driver's companion. Several defendants settled the claims against them prior to trial. A jury trial accompanied by extensive publicity commenced on December 20, 2004. In mid-January 2005, the jury returned a verdict in favor of Antonia and her mother in the aggregate amount of $109,667,750 against defendants Harry M. Stevens, Inc. of New Jersey (Harry M. Stevens), the holder of the license to sell alcoholic beverages at Giants Stadium, and defendant Aramark Services Management of New Jersey, Inc., Aramark Corporation, and Aramark Sports and Entertainment Group, Inc. (Aramark). Harry M. Stevens was a wholly owned subsidiary of Aramark. This court reversed the verdict and remanded the matter for a new trial. Verni ex rel Burstein v. Harry M. Stevens, 387 N.J.Super. 160, 903 A.2d 475 (App.Div. 2006), certif. denied, 189 N.J. 429, 915 A.2d 1052 (2007).
Prior to commencement of the new trial, Antonia and her mother reached a settlement with Aramark. They applied for an order to seal the amount and terms of the settlement but not the fact of a settlement. The motion was unopposed but plaintiffs presented the testimony of Antonia's guardian ad litem who explained the reasons for the application. On June 7, 2007, the judge entered a consent order that provided "the balance of all proceedings *408 in this matter shall be filed under seal and the Clerk is hereby instructed to accept any and all filings under seal."
The order was accompanied by an opinion in which the judge explained his ruling. He related that Antonia's father, Ronald Verni, had misappropriated funds received from settlements earlier in the litigation from other defendants. He found that protection of the settlement funds was an important government interest. He also noted that a history of domestic violence required issuance of a restraining order. He reasoned that sealing the record of the settlement minimized the chances that Antonia's father, who is estranged from the family, would return to New Jersey. For these reasons, the judge concluded that "sealing the balance of the record ... is clearly justified." That opinion and the tape of the reading of the opinion were included within the sealing order.
On October 10, 2007, Public Citizen filed a motion to intervene and to unseal the record. By order dated November 16, 2007, the court granted the motion to intervene but denied the motion to remove the seal. The judge released his previously sealed June 7 opinion to enable the parties to "understand the rationale and reasons why the settlement and the hearings themselves must remain sealed." It is from this order that Public Citizen appeals.
Public Citizen argues that the common law, rules of court, and the First Amendment of the United States Constitution recognize the need for open court records and court proceedings. It also contends that a court record or court proceeding may be sealed only to protect a substantial interest, and the Verni family's articulated interest in privacy does not justify the June 7 order. Public Citizen also maintains that the order is overbroad and that the countervailing public interest in dissolving the seal is strong.
Antonia and her mother respond that the order was appropriate under the circumstances of this case. They emphasize that they have identified a specific harm that militates against indiscriminate dissemination of information about the ultimate disposition of the case. Aramark argues that the sealing order advances the individual and public interests in assuring the preservation of the settlement fund for Antonia's needs.
There has been some uncertainty about the scope of the June 7 order. Plaintiffs suggested that it was meant to seal only orders, documents and testimony relating to the settlement of the personal injury matter and was not intended to encompass a fee dispute between plaintiffs' initially retained attorney and substituted trial counsel. Public Citizen argued that all proceedings from June 1, 2007, when the "friendly" proceeding[1] was conducted and Antonia's guardian ad litem testified, through the ultimate resolution of the fee dispute remained sealed.
The terms of the June 7, 2007 order are not confined to the settlement of the personal injury claims of Antonia and her mother. Public Citizen filed a motion to supplement the record with certain documents, including a copy of the docket sheet for this matter. We have granted that motion and the docket sheet confirms our interpretation of the June 7 order. That is, all proceedings and all documents filed in conjunction with this matter since June 1, 2007, have been placed under seal.
The breadth of the June 7 order is inconsistent with the principles guiding the imposition of a seal on judicial proceedings. Furthermore, given the wide-ranging *409 publicity and comment generated by the accident and attendant litigation, plaintiffs have failed to demonstrate that their concerns for privacy outweigh the strong presumption of access to court records.
Rule 1:2-1 directs that all proceedings in the courts of this State shall be conducted in open court. Pertinent to the issues in this case, the rule provides that no record of any proceeding may be sealed except on a showing of good cause. This requirement has its roots in our common law aversion to and distrust of secret trials. Sheppard v. Maxwell, 384 U.S. 333, 349-50, 86 S.Ct. 1507, 1515, 16 L.Ed.2d 600, 613 (1966); Smith v. Smith, 379 N.J.Super. 447, 451, 879 A.2d 768 (Ch.Div. 2004). Moreover, our Supreme Court has acknowledged that the First Amendment, the history of this State, and our court rules require that civil proceedings shall be open to the public unless "an important state interest is at stake." N.J. Div. of Youth & Family Servs. v. J.B., 120 N.J. 112, 127, 576 A.2d 261 (1990).
In Hammock v. Hoffmann-LaRoche, Inc., 142 N.J. 356, 662 A.2d 546 (1995), Public Citizen, the intervenor in this case, sought access to material filed with the court in support of and in opposition to certain motions in a pharmaceutical products liability case. Some of the documents attached to the motion papers were subject to a protective order. Id. at 361, 662 A.2d 546. The Court noted that the good cause requirement of Rule 1:2-1 is not defined; therefore, it announced guidelines for deciding when the public should have access to documents filed with the court during the course of litigation. In doing so, the Court summarized its review of precedent and noted that "[t]here is a presumption of public access to documents and materials filed with a court in connection with civil litigation." Id. at 375, 662 A.2d 546. The right to access is not absolute and a court may craft an appropriate protective order. Ibid. The party or person seeking to overcome the presumption in favor of public access bears the burden to convince a court that the interest in secrecy outweighs this presumption. Id. at 375-76, 662 A.2d 546. Finally, a reasonableness standard applies when a person or party seeks to rebut the presumption of openness. Id. at 376, 662 A.2d 546.
The Court proceeded to recognize a "profound public interest when matters of health, safety and consumer fraud are involved" that is independent of the interest of the parties to the litigation. Id. at 379, 662 A.2d 546. Therefore, a judge must carefully scrutinize an application to seal records or documents "in a high public-interest case." Ibid.
Moreover, although the decision to seal or unseal documents is vested in the discretion of the judge, that discretion is not unfettered. Id. at 380, 662 A.2d 546. In fact, the Court stated that it should be "structured." Ibid. The Court held that dispositive motions, such as summary judgment motions, require public access, ibid., and further directed that a judge must utilize "a flexible balancing process adaptable to different circumstances ... to determine whether the need for secrecy substantially outweighs the presumption of access." Id. at 381, 662 A.2d 546 (emphasis supplied). In addition, "the person who seeks to overcome the strong presumption of access must establish by a preponderance of the evidence that the interest in secrecy outweighs the presumption. The need for secrecy must be demonstrated with specificity as to each document." Ibid.
The Court also emphasized that the use of a protective order at one stage of the proceeding does not create a presumption that the order is required in perpetuity. Therefore, the proponent of a sealing order *410 must demonstrate the current need for such protection. Id. at 382, 662 A.2d 546. Finally, the judge "must examine each document individually and make factual findings with regard to why the presumption of public access has been overcome." Ibid.
In Lederman v. Prudential Life Insurance Co., 385 N.J.Super. 307, 897 A.2d 362 (App.Div.2006), this court addressed a motion by intervenor media companies to unseal the record in civil litigation commenced by former employees against their employer and the law firm that had represented the employees in alternate dispute resolution. We recognized not only the common law right of access to judicial proceedings and to inspect judicial records but also the First Amendment right of the media intervenors to access civil and criminal proceedings. Id. at 315-16, 897 A.2d 362. Applying the guidelines announced in Hammock, we held that the employer's interest in vindicating a contractual confidentiality agreement with its employees did not override or outweigh the presumption in favor of public access. Id. at 317-18, 897 A.2d 362. We noted that the employer had failed to show "a specific, serious injury that would result from lifting the seal." Id. at 319, 897 A.2d 362. Indeed, the complaint filed by the former employees was widely disseminated to the public through the internet and news media when it was filed with the court. Id. at 321, 897 A.2d 362. Furthermore, the former employees' allegations that their employer engaged in business practices discouraging the sale of its products to minorities and had compromised their attorney-client relationship raised issues of significant public interest and importance. Id. at 312-13, 322, 897 A.2d 362.
A personal interest in privacy and freedom from annoyance and harassment, while important to the litigant, will not outweigh the presumption of open judicial proceedings even in relatively uncomplicated and non-notorious civil litigation. Zukerman v. Piper Pools, Inc., 256 N.J.Super. 622, 628-29, 607 A.2d 1027 (App.Div.), certif. denied, 130 N.J. 394, 614 A.2d 617 (1992). On the other hand, when an application is filed with a court that pertains to a purely private matter, an order sealing the submissions may be appropriate. See In re Trust Created by Johnson, 299 N.J.Super. 415, 423, 691 A.2d 391 (App. Div.1997) (financial information submitted to the trustees in support of a discretionary distribution from a trust created for the benefit of the beneficiary and her family may be sealed because of the absence of any meaningful public interest in a private trust dispute).
Measured by these principles and guidelines, the June 7 order must be vacated. The breadth of the order is entirely inconsistent with the guidelines articulated in Hammock and recently reiterated in Lederman. While the judge may have intended the order to apply only to the terms of the settlement agreement and the transcript of the guardian ad litem's June 1, 2007 testimony, its express terms are without limitation. As noted, the order has been applied to seal all proceedings subsequent to that date and prevents the public from obtaining information about the resolution of the fee dispute between the attorneys. Without an event-by-event and document-by-document review, such a sweeping order cannot stand.
The seal of the proceedings associated with the settlement of the litigation, including the testimony of the guardian ad litem and the settlement documents, fares no better. Plaintiffs have advanced no reasons for sealing the settlement proceedings and documents other than a simple desire for privacy. They have presented evidence of Ronald Verni's past behavior that includes acts of domestic violence and *411 misappropriation of settlement funds. Based on his past behavior, plaintiffs argue that revelation of the amount of the settlement may entice Ronald Verni to return to New Jersey and attempt to obtain a portion of the settlement proceeds.
We do not minimize the gravity of Ronald Verni's past behavior and the impact it has had on his family. We are mindful, however, that a final domestic violence restraining order limits Ronald Verni's contact with the family. Ronald Verni's prior access to and misuse of the settlement funds obtained from defendants other than Aramark caused him to be removed as guardian ad litem, and an independent person was appointed to protect Antonia's interests in the prosecution of the personal injury action. His actions and the cause of his removal as guardian ad litem are a matter of public record.
Moreover, since the settlement, a trustee controls distributions from the settlement fund. While there is no guarantee that Antonia's father may not try to obtain a distribution directly from the trustee or indirectly through his now eleven year old daughter, the trustee is aware of his fiduciary obligation to Antonia and can undoubtedly deflect any such entreaties. Furthermore, although the need to protect the safety of Antonia and her mother and to preserve the settlement fund for Antonia's benefit are important, other circumstances unique to this case counsel against allowing Antonia and her mother's personal interests to outweigh the public interest in open judicial proceedings.
Antonia's unfortunate injury attracted media attention and public interest from the time of the accident. Laura Barnhardt, Girl Injured Critically; Driver faces DUI charge pickup hit small car head-on, police say, The Record (Bergen County), Oct. 26, 1999, at News L1. The personal injury action filed by Antonia and her mother garnered wide media attention when filed, Jane Allande-Hession, N.F.L. Is Sued Over a Crash That Left a Child Paralyzed, N.Y. Times, Oct. 11, 2003, at B5; Linda Campbell, Op-Ed., Where Does the Buck Stop? A New Jersey drunken driving case raises good questions about corporate and personal liability, Fort Worth Star-Telegram (Texas), Oct. 23, 2003, at 11B; Randy Covitz, NFL's Taste for Beer to Spill Over into Courtroom, Kansas City Star (Missouri), Oct. 20, 2003; Wayne Parry, NFL Sued Over Crash that Left Girl Paralyzed, Star-Ledger (Newark), Oct. 11, 2003, at News 23; Peter Pochna, Family Sues NFL for Fan's DWI that Left Child Paralyzed, The Record (Bergen County), Oct. 10, 2003, at A01; during the trial, Ana M. Alaya, Jurors Touched by Paralyzed Girl, 7, Star-Ledger (Newark), Dec. 10, 2004, at New Jersey 29; Ana M. Alaya, Driver Testifies He Doesn't Recall Paralyzing Child, Star-Ledger (Newark), Dec. 19, 2004, at New Jersey 19; Ana M. Alaya, Giants Exec Denies `Culture of Intoxication' in Beer Sales, Star-Ledger (Newark), Jan. 12, 2005, at New Jersey 16; Kibret Marcos, Jury Deliberates Beer Vendor Case; Lawyer shows video of girl paralyzed by DWI crash, The Record (Bergen County), Jan. 14, 2005, at L01; and after the trial when the jury returned the stunning $109,667,750 verdict, £40M For Girl Hit by Drunk Trucker, Sunday Mail (Scotland), Feb. 6, 2005, at 43; Jury Awards Family $60 Million, Edmonton Journal (Alberta), Jan. 19, 2005, at D6; Ana M. Alaya, Jury Finds Giants Vendor Shares Blame in Crash, Star-Ledger (Newark), Jan. 19, 2005, at News 1; Ana M. Alaya, Jury Adds $75 Million Penalty for Beer Seller, Star-Ledger (Newark), Jan. 20, 2005, at New Jersey 13; MichaelAnn Knots, $100M Beer Binge, N.J. Lawyer, Jan. 24, 2005, at 1; Kibret Marcos, DWI Crash Award Rises to $135M; Stadium beer vendor hit *412 with $75M punitive judgment, The Record (Bergen County), Jan. 20, 2005, at L01; Mark Maske, Ruling May Affect Team Policies, Wash. Post, Jan. 22, 2005, at D03; Leo Standora, 60M Award to N.J. Girl Paralyzed by a Drunk, Daily News (New York), Jan. 19, 2005, at News 6; Vito Stellino, Crackdown on Drinking, Florida Times-Union (Jacksonville), Jan. 23, 2005, at C15.
The media and public interest did not wane after the appellate process. The opinion reversing the verdict and remanding for a new trial was published and widely reported in the media. $105M Verdict Tossed; High court appeal planned, N.J. Lawyer, Aug. 7, 2006, at 2; Ana M. Alaya, $135M Jury Verdict Against Stadium Beer Vendor Overturned, Star-Ledger (Newark), Aug. 4, 2006, at News 1; Laura Mansnerus, Court Overturns Jury Award Against Stadium Concessionaire, N.Y. Times, Aug. 4, 2006, at B3; E.E. Mazier, Negligence; Many errors in the first trial require new trial of action under the dram shop statute, N.J. Lawyer, Aug. 21, 2006, at 26. The issues raised by the case have also been the subject of comments in scholarly articles. Survey, 2006 Annual Survey: Recent Developments in Sports Law, 17 Marq. Sports L.Rev. 585 (2007); Gregory P. Diamantopoulos, Note and Comment, A Look at Social Host and Dram Shop Liability From Pre-Game Tailgating to Post-Game Barhopping, 4 DePaul J. Sports L. Contemp. Probs. 201 (2008).
The case presented issues of significant public concern, such as whether the owner and operator of the stadium and organized football engaged in practices that encouraged socially irresponsible behavior, such as excessive consumption of alcohol. The case squarely presented the issue whether the dispenser of alcoholic beverages at the stadium had a realistic plan to monitor the sale and consumption of alcohol, and did, or even could, effectively limit the sale of alcoholic beverages in a stadium setting to intoxicated patrons. These issues are as infused with public interest as unsafe products, Hammock, supra, and discriminatory insurance practices, Lederman, supra.
We are also compelled to observe the anomaly created by the June 7 order. The amount of the original verdict was announced in open court and widely disseminated. The parties were prepared to retry the case, and plaintiffs' attorney conceded that the entire second trial, including the return of the verdict, would occur in open court. Thus, if plaintiffs were successful in the second trial, the amount of the damage award would be known to all. They concede that any application to seal that aspect of the proceedings would probably have failed. Ronald Verni, of course, would have learned the full measure of the award. We fail to discern the compelling interest that allows plaintiffs to shroud the amount and terms of the settlement in secrecy by settling the case prior to trial.
Furthermore, intervenor has brought to our attention advertisements placed by plaintiffs' attorney in legal publications in which he extols his successes in various litigated matters.[2] The advertisements generally describe cases and list them in descending order of magnitude of settlement or verdict. This case is listed first with a notation that the amount is confidential. The clear implication, however, is that the settlement exceeds the next cited case in which plaintiffs' attorney states he *413 obtained $39,000,000 in settlement of a class action.
We reiterate our words in Lederman that "[t]he presumption of openness to court proceedings requires more than a passing nod. Open access is the lens through which the public views our government institutions." Lederman, supra, 385 N.J.Super. at 323, 897 A.2d 362. Here, plaintiffs have not demonstrated that their desire for privacy overcomes the strong presumption of access to court records.[3] We, therefore, reverse the June 7, 2007 order sealing all proceedings and records from June 1, 2007 forward.
Reversed.
NOTES
[1] See R. 4:44-3.
[2] This information was included in intervenor's motion to supplement the record, which we have granted. This information, however, is also subject to judicial notice. N.J.R.E. 201(b)(3).
[3] This result is entirely consistent with proposed Rule 1:38 governing access to court records. Indeed, proposed Rule 1:38-9 incorporates the guidelines adopted in Hammock and recently reiterated in Lederman.